# STATE v. A. H. McMASTERS.[1]

February 10, 1939.

No. 31,798.

L. P. Johnson and *Edward P. Kelly,* for appellant.

*William S. Ervin,* Attorney General, *Edgar S. Young,* Special Assistant Attorney General, and *C. A. Johnson,* County Attorney, for the State.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly,* on behalf of Associated Master Barbers of Minnesota, and *George L. Siegel,* on behalf of Minnesota State Journeymen Barbers Association, filed

[1]Reported in 283 N. W. 767.

separate briefs *amici curiae* in support of the constitutionality of the act.

HOLT, JUSTICE.

Defendant charged a customer 40 cents for a haircut. He was arrested and convicted in the municipal court of Mankato for a violation of the so-called barbers' code, fixing the minimum prices for the different services rendered by a barber, such price for a haircut being 50 cents. The sentence pronounced was a fine of $25 or confinement in the county jail for 30 days. Defendant appeals.

The violated code has for its sole authority L. 1937, c. 235 (3 Mason Minn. St. 1938 Supp. §§ 5705-31 to 5705-38), entitled: "An act to prevent unfair competition and unfair trade practice in service trades under certain conditions." It provides: (§ 1) That upon application to the governor for relief from unfair competition and unfair trade practices resulting in unemployment, economic distress, and disorganization of service trades engaged in rendering personal services upon persons, licensed and regulated by the state, the governor is authorized to "investigate, ascertain, declare and prescribe reasonable rules, regulations, or standards, to prevent such unfair competition * * * to establish standards of maximum hours of labor, minimum rates of pay and working conditions," etc. The application to the governor (§ 2) must be made by "not less than sixty-five per cent of all persons, firms and corporations engaged in such service trades," etc. The rules, regulations, or standards to prevent unfair competition "shall be prescribed and approved by the governor after such reasonable public notice and hearing as he shall specify and if he finds: (1) that such rules, regulations or standards are not designed to promote monopolies or to eliminate or oppress such service trades and will not operate to discriminate against them and will tend to effectuate the policy of this act; (2) that such rules, regulations or standards are not inequitable and the interests of the consumers and the general public will be protected"; and (3) that the same "are necessary for the stabilization of the business of such service trades, the governor may, as a condition of approval of any such rules,

regulations or standards, impose such conditions for the protection of consumers, competitors, employes and others, and in the furtherance of the public interest, and may provide such exceptions to and exemptions from the provisions of such rules, regulations or standards as in his discretion is deemed necessary to effectuate the policy declared in this act." Section 3 makes such rules so adopted by the governor binding upon everyone in such trade or business.

Section 4 provides for assessments against and collection from all persons, firms, and corporations in the trade, on a fair basis, sufficient money for expenses incurred in administering the code so adopted.

Section 5 provides that all orders of the governor "prescribing, approving, disapproving, modifying, amending or terminating rules, regulations or standards shall be subject to review by any district court of the state." But no injunction suspending any rule, regulation, or standard shall be granted except upon filing of a good and sufficient bond running to the state and enforcible by the governor on behalf of all parties in interest, conditioned for the payment of all damages, loss of profits and of wages which may be sustained by any employer or employe, in the event that the injunction is not made permanent.

Section 6 invests the district courts of the state with jurisdiction to restrain violation of the rules, etc.

Section 7 makes violations misdemeanors, as well as refusals to comply with "any notice duly issued by the governor."

Section 8: "The governor may designate or appoint such agents, deputies, commissioners, or any department of the state, to administer and enforce every order, rule, regulation or standard prescribed or approved by him."

In several states similar laws fixing maximum hours and minimum prices for services in trades recite that the unprecedented depression necessitated emergency legislation to remain in effect only for a designated time. No such excuse is given for the enactment of this law. Evidently this sort of legislation is patterned after acts of congress authorizing the President to formulate codes for various purposes. The code here attacked, purporting to have

been formulated and promulgated by the governor in virtue of said c. 235, is very comprehensive and exacting as to maximum hours of labor and minimum prices and wages. It even converts the Minnesota State Board of Barber Examiners into a trade commission to enforce the orders of the governor. However, we are not in this appeal concerned with any provisions of the code except that which fixes the minimum rate for a haircut. The offense alleged is that on January 14, 1938, at his barbershop, in the territory specified in the code, defendant cut the hair of one W. H. Colby for the price of 40 cents, said price being less than the minimum price established by art. IX, § 3, of the code mentioned.

Three propositions are urged for a reversal. The first is that the code formulated by the governor is arbitrary in many respects. The law authorizing the governor to make the code prescribes certain steps to be taken, hearings to be had, and permits a review of his action by the district courts. It is to be assumed that the provisions of the law in these respects have been complied with. There is no suggestion in the record that the code is arbitrary as to the territory embraced, nor that the district court has been asked to review the minimum price fixed. No evidence was offered in this case that 50 cents was too high a minimum price for a haircut. So the first proposition must be decided against defendant. State ex rel. Attorney General v. Fasekas, 223 Wis. 356, 269 N. W. 700.

The second ground of attack is that L. 1937, c. 235, attempts to confer upon the governor and administrative agencies created by him legislative powers which lawfully cannot be delegated. The fact that the authority is given to a person rather than to a board or commission cannot affect the lawfulness of the power. It is enough to refer to Williams v. Evans, 139 Minn. 32, 165 N. W. 495, 166 N. W. 504, L. R. A. 1918F, 542, and G. O. Miller Tel. Co. v. Minimum Wage Comm. 145 Minn. 262, 177 N. W. 341, where L. 1913, c. 547, establishing a minimum wage commission, was unsuccessfully assailed as unconstitutional on the ground that legislative functions were attempted to be delegated to the commission. These decisions were thought to have been rendered ineffective by Adkins

v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 67 L. ed. 785, 24 A. L. R. 1238, but are now revived by West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 S. Ct. 578, 81 L. ed. 703, 108 A. L. R. 1330. To be sure, L. 1913, c. 547, is a carefully drawn act of wide application, whereas L. 1937, c. 235, is crudely conceived and expressed, and perhaps designed to embrace only the barbers. Whether a state statute unlawfully delegates legislative functions to a person or to a commission is primarily for the state courts. Highland Farms Dairy, Inc. v. Agnew, 300 U. S. 608, 57 S. Ct. 549, 81 L. ed. 835. In Gibson Auto Co. Inc. v. Finnegan, 217 Wis. 401, 259 N. W. 420, the court held invalid a recovery code, framed according to the federal recovery codes, because the law itself gave the formulation of the code not to the governor, but to the group that applied to him for its approval. The court also construed that act an attempt to delegate the power of the legislature to determine whether or not there shall be a code to a preponderant majority of the persons of an unascertained group, hence void. After that decision the act was amended, and again came before the court in In re Petition of State ex rel. Attorney General, 220 Wis. 25, 264 N. W. 633. It was then sustained. The amended act eliminated the provision that the proposed code was to be approved by a preponderant majority of the group to be affected by its provisions, and also restricted the governor to such regulation and price fixing as reasonably eliminated unfair competition and unfair trade practices. The Wisconsin court considered that the amended act furnished the governor a sufficient standard upon which to base his findings and formulate his codes so as to avoid the charge of the act being an unlawful attempt to delegate legislative powers to the governor. The court pointed out that prior to the amendment of the act the decision had been rendered in A. L. A. Schechter Poultry Corp. v. United States, 295 U. S. 495, 55 S. Ct. 837, 79 L. ed. 1570, 97 A. L. R. 947, holding the unfettered code-making powers conferred on the President by the National Recovery Act to be an unconstitutional delegation of legislative power. So the amendment of the Wisconsin statute was construed as intended to meet the demands of the Schechter decision. The supreme court of Wiscon-

sin, intending no doubt to decide nothing contrary to the Schechter case, nevertheless construed the amendment of their act as not an unconstitutional delegation of legislative power to the governor. Our L. 1937, c. 235, attempts to follow the wording of the amended Wisconsin act so far as providing a standard for the governor's code making.

The next claim advanced is that fixing a minimum price for a barber's services is obnoxious to the personal liberty of contract— contravening the due process clause of the fifth and fourteenth amendments of the federal constitution as well as that of our own constitution. As far as concerns the federal amendments mentioned, it is rather clear that the views expressed by the minority of the United States Supreme Court in Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 67 L. ed. 785, 24 A. L. R. 1238, have now become the views of the majority of that court. Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. ed. 940, 89 A. L. R. 1469; West Coast Hotel Co. v. Parrish and Highland Farms Dairy, Inc. v. Agnew, *supra*. Of course there is a far cry from the conditions which call for the regulation of milk prices in a state and those that demand fixing the minimum prices for barbers' services. Whether price fixing in the trades is accomplished through strikes, now recognized by law as lawful means, or by codes or rules formed in virtue of legislative enactments akin to our said c. 235, the effect on public welfare is generally the same. The main objective, somewhat disguised, is the welfare of the trade rendering the services. The general public interest, if any, is indirect and incidental. Minimum price fixing for services of the barber trade has of late engaged the attention of several state courts. As a rule, every decision has been rendered by a divided court, or at least a minority has objected vigorously to the ground upon which the majority opinion is based. All agree that the right to fix prices or wages is derived from the police power of the state and that conditions must exist invoking its action. Some courts assert that the barbers' trade is fraught with public interest in that contagion and disease might be spread unless practiced under proper regulations and that minimum price fixing is a part of such regulations. Other

courts deny the trade to be so affected with a public interest or clothed with a public use as to justify the state in the exercise of its police power to fix minimum prices. So holding may be cited City of Mobile v. Rouse, 27 Ala. App. 344, 173 So. 254; *Id.* 233 Ala. 622, 173 So. 266, 111 A. L. R. 349 (voiding an ordinance relating to barbers' services and prices authorized by a statute somewhat resembling our c. 235) ; In re Kazas, 22 Cal. App. (2d) 161, 70 P. (2d) 962 (an ordinance of the same import and statutory authorization as in the Alabama case, held void as violative of due process guarantee of state and federal constitutions) ; State ex rel. Fulton v. Ives, 123 Fla. 401, 167 So. 394 (a code formed by the board of barber examiners by virtue of a statute held void for the same reasons as in the Alabama case) ; Duncan v. City of Des Moines, 222 Iowa, 218, 268 N. W. 547 (held void an ordinance framed under a statute similar to that in the Alabama case). The decisions in the following cases sustain a code fixing a minimum price for barber services pursuant to a statute authorizing a board or the governor to formulate the code: Herrin v. Arnold, 183 Okl. 392, 82 P. (2d) 977; Board of Barber Examiners v. Parker, 190 La. 214, 182 So. 485 (where, on rehearing, the decision first arrived at was reversed) ; State ex rel. Attorney General v. Fasekas, *supra.* We think the decisions of the majority in the Louisiana and Oklahoma cases should be followed. It is unnecessary to add to the exhaustive discussion already in the state reports of the cases above cited or to quote therefrom.

We conclude that L. 1937, c. 235, does not contravene any constitutional provision, state or federal, and that the code formulated and promulgated thereunder, insofar as it fixes the minimum price for a haircut, is valid. The wisdom of such group legislation may be doubted. It may be inimical to the best interests of the group it seeks to favor, to say nothing of public good. But that is for the legislature and not the courts.

The conviction is affirmed.